Ronald E. BROOKS, Plaintiff,

v.

PROTECTIVE LIFE INSURANCE COMPANY; Alabama Power Company, Defendants.

Civ. A. No. 92–D–1577–E.

United States District Court,
M.D. Alabama,
Eastern Division.

March 21, 1995.

Lister Hill Proctor, Sylacauga, AL, for plaintiff.

Leslie McCafferty Allen, David R. Boyd, Montgomery, AL, John Richard Carrigan, Birmingham, AL, for defendants.

## MEMORANDUM OPINION

DE MENT, District Judge.

Plaintiff, Ronald E. Brooks (hereinafter "Brooks"), brings this action against his former employer, Alabama Power Company (hereinafter "APCo") and Protective Life Insurance Company (hereinafter "Protective"), the claims administrator of APCo's long-term disability plan (hereinafter the "Plan"), to reinstate Plaintiff's benefits under the Plan. The Plan is governed by the Employee Retirement Income Security Act (hereinafter "ERISA"), 29 U.S.C. § 1001 *et seq.* Brooks alleges that his long-term benefits were wrongfully terminated by APCo and Protective, both of whom are express fiduciaries under the Plan. Plaintiff asserts that the benefits should be reinstated, and judgment entered for the arrearage, attorney's fees and costs.

This case was submitted to the court on the parties' pleadings. Plaintiff filed a brief and evidence in support of his claim on November 15, 1994. On December 5, 1994, Defendants filed a brief and supporting evidence in opposition thereto.

### JURISDICTION

Jurisdiction is proper under 28 U.S.C. § 1331 because Plaintiff alleges a violation of 29 U.S.C. § 1001, *et seq.*, ERISA. Personal jurisdiction and venue are not contested.

### FINDINGS OF FACT

Brooks worked for Defendant, APCo, from 1961 until 1983. During the course of his twenty-two year tenure with APCo, Brooks performed various jobs including meter reading in Pell City and Talladega, Alabama. As an APCo employee, Brooks chose to participate in APCo's 1981 Long Term Disability Plan (the "Plan").

In 1983, Brooks suffered a nonwork-related injury. Subsequently, Brooks filed a total disability claim and was deemed totally disabled. Consistent with the Plan's terms, Protective awarded Brooks total disability benefits in the amount of four hundred sixty-eight and 14/100 dollars ($468.14) commencing March 15, 1984, for a period of thirty

months.[1] Protective relied upon medical records produced by Plaintiff's treating physician, Dr. David Hensleigh to make its determination that Brooks could not perform his assigned lineman duties.[2] Dr. Walter C. Woodall (hereinafter "Dr. Woodall") performed a lumbar disc laminectomy on Brooks in March, 1983, and was Brooks' attending physician at all relevant times.

Brooks' initial thirty months of benefits expired September 15, 1985. Protective determined that Brooks qualified for total disability for all jobs for which Plaintiff was "reasonably fitted by education, training or experience." Plaintiff contends, and Defendants do not rebut, that Protective continued to award Brooks disability benefits based on the medical reports and advice of Dr. Woodall.

Patrick J. West (hereinafter "West"), assistant manager of medical and disability claims for Defendant Protective, became involved with claims administration following revision of the Plan.[3] Protective, with the advice and assistance of West and other claims adjusters, determined whether a claimant was disabled and, thus, entitled to receive long-term disability benefits under the Plan.[4] From 1987 to January, 1991, West reviewed Plaintiff's claim file and approved monthly benefits for Brooks based

solely on two (2) physician statements from Dr. Woodall.[5]

APCo revised its long-term disability plan in 1987, and the amended version became effective January, 1990. The revised plan granted Protective the authority to terminate a participant's benefits if such participant refused to cooperate with Protective in job placement and vocational rehabilitation.[6] At about this time, APCo allegedly advised Protective to review all long-term disability claim files to determine if APCo could reinstate able workers. According to West, he could not remember APCo requesting that he review all the long-term disability claim files, prior to January, 1991.[7] West also stated that APCo's desire to remove persons from the list of persons eligible for long-term disability benefits was the impetus behind APCo amending the Plan.[8] West also remarked that he took APCo's position into consideration when determining Brooks' continued eligibility under the Plan.

Helen Spollen (hereinafter "Spollen"), coordinator of disability management services for APCo, stated that Brooks' claim for benefits would be controlled by the Plan, not by the revised plan of 1990. Plaintiff, therefore, contends that neither APCo nor Protective could use the new provision on rehabilitation to take action against a long-term dis-

---

1. The Plan provides benefits to any participant who suffers a covered total disability, which is defined in Section 1.16 of the Plan as follows:
 .... in the case of a Participant whose primary occupation is other than piloting or action as a member of the crew of an aircraft, a condition of being disabled by bodily sickness or disease if
 (a) during the first thirty months of any Period of Total Disability, such participant is unable to perform all the duties of his occupation; and
 (b) during continuation of the Period of Total disability beyond thirty months, such Participant is unable to engage in any business or occupation or to perform any work for compensation, gain or profit for which he is reasonably fitted by education, training or experience.

2. *See* Attending Physician's Statement, dated (Plaintiff's Exh. 2).

3. West depo. pp. 6, 7.

4. West depo. pp. 10, 11.

5. West depo. pp. 54, 55.

6. Pursuant to Section 6.02 of the Revised Plan, entitled *Allocation of Responsibilities:*

 Responsibility shall be allocated among the Named Fiduciaries as follows:
 (c) The claims administrator shall be responsible for determining eligibility for benefits under the Plan and the payment of such benefits. Additionally, the Claims Administrator may under appropriate circumstances assist Participants in returning to gainful employment and obtaining all disability benefits for which they are eligible through (1) rehabilitation coordination and counseling; (2) Social Security counseling; and job placement services. If the Participant fails to cooperate with the Claims Administrator's provisions of such counseling and services, the Participant's eligibility for benefits under the Plan will cease....

7. West depo., pp 40–42.

8. West depo. p. 47.

ability recipient, such as Brooks, if he refused vocational training/rehabilitation services. On January 24, 1991, Mrs. Debra Waldrep (hereinafter "Waldrep"), a Protective claims examiner, solicited Dr. Woodall for Plaintiff's medical records covering 1989 through January, 1991.[9] A copy of Waldrep's letter was delivered to APCo, as well. Dr. Woodall examined Brooks on February 27, 1991, and noted that there was no change in Brooks' status and that Brooks could not tolerate standing for more than 20–30 consecutive minutes. Dr. Woodall also stated that he saw no reason to change Brooks' status at that time. Subsequently, Protective, by Waldrep, requested more specific information regarding Brooks' disability and Dr. Woodall responded to the inquiry on March 15, 1991.[10] Based on these assessments, West acknowledged that Brooks met the definition of total disability under the Plan.[11] However, on April 10, 1991, West requested that Brooks undergo a medical examination by an independent physician to determine Brooks' physical limitations and tolerances.

Protective arranged for Crawford and Company (hereinafter "C & C") to arrange the independent medical examination. C & C in turn procured the services of Dr. Patrick Ryan (hereinafter "Dr. Ryan") to perform the examination. Dr. Ryan met with Brooks on June 12, 1991. Brooks asserts that the documents sent to Dr. Ryan did not include a definition of total disability under the Plan. Plaintiff contends that the records only consisted of Dr. Woodall's medical notes dated February 27, 1991, November 7, 1989, and a radiologist's report dated November 15, 1989.[12]

Dr. Ryan's examination lasted approximately fifteen minutes and entailed bending at the waist and tapping on Brooks' heel,

knee and ankle. Dr. Ryan did not have Dr. Hensleigh's medical records, or Brooks' Social Security disability records, nor a complete set of medical notes. Plaintiff also mentions that Dr. Ryan did not have any of the physician supplemental medical statements from Dr. Woodall, nor did he possess Dr. Woodall's report of March 15, 1991, which showed Brooks to be totally disabled under the Plan.[13] Dr. Ryan did not espouse any recommendations concerning activity restrictions for Brooks neither did he perform a functional capacity evaluation (hereinafter "FCE"). However, Dr. Ryan's examination did reveal that Plaintiff suffered from lumbar radiculitis with lumbar nerve root involvement, atrophy of the left leg, loss of sensation in the left leg, diminished reflexes and progressive pain which intensifies with prolonged activity.

In his report to Protective, Dr. Ryan stated that he thought Brooks could only perform sedentary tasks, such as working at a desk.[14] Dr. Ryan also noted that Brooks could not perform the task of meter reader and recommended a work hardening program and vocational rehabilitation for Brooks before placing him in any job.[15] After receiving Dr. Ryan's report, C & C wrote Protective on June 25, 1991, and recommended that Protective look into a position for Brooks at APCo. The letter also recommended that a job analysis be presented to Brooks' physician for his approval. West states that he never pursued this course of action. C & C also told West that a work hardening program might be needed, as Brooks had not worked since 1983. According to West, no one pursued this course of action either.

Brooks asserts that on July 1, 1991, West wrote Bill Warren at APCo and stated that, based upon Dr. Ryan's evaluation, it ap-

9. In her letter, Mrs. Waldrep requested a copy of Brooks' patient notes in order to properly document his claim file.

10. According to this report, Brooks could not: 1) sit for periods exceeding 30–40 consecutive minutes; stand for 15–20 consecutive minutes, bend, or walk distances greater than one block. Moreover, Dr. Woodall stated that he considered Brooks disabled for his occupation and totally disabled for all occupations.

11. West depo. pp. 62–66.

12. Ryan depo. pp. 8–9.

13. Ryan depo. pp. 6, 10–14.

14. Ryan depo. pp. 37–38.

15. Ryan depo. pp. 46–50.

peared that Brooks may be able to return to work. West also requested a job search. In this letter, West noted that Brooks could possibly return to work after a vocational assessment. Brooks contends that on July 1, 1991, West possessed a copy of Dr. Woodall's statement declaring Brooks disabled for all occupations.

Plaintiff also avers that as of July 1, 1991, West did not have an FCE, a vocational evaluation, or a job description. Plaintiff contends that West's opinion as of July 1, 1991, was that Brooks could read meters. Waldrep and West then wrote Brooks on July 9, 1991, and July 11, 1991, respectively, stating that Protective and APCo would assess his physical capabilities, in order to determine whether he (Brooks) could return to work.[16]

Brooks underwent an FCE on July 23, 1991. Plaintiff claims that this was conducted without benefit of specific job descriptions. The examiner recommended a work hardening program with a specific job to which Brooks would return. Although the evaluator could not assess Brooks' work restrictions, so Plaintiff contends, the evaluator affirmatively expressed that Brooks should avoid prolonged activity that aggravated his back and leg pain, including squatting, bending, sitting and standing.

In October, 1991, Betty Logan of C & C administered Brooks' vocational evaluation and reported the following to Protective:

> It is felt that since this man has been out of work for over eight years, that he may need some type of reconditioning prior to him [sic] returning back into the work force. This reconditioning could come in the form of some type of work hardening should he move in that direction ... it would be difficult to push him back into the

job market at this time and ask him to participate successfully in a job without conditioning.

In November, 1991, Dr. Woodall reported to Protective that Brooks was totally disabled as a lineman, but he could attempt full-time employment only after Brooks underwent a vocational training regime.

Protective did not contact Brooks again until June 30, 1992. Via a letter from Waldrep, Protective stated that it *heard* that Brooks was returning to work with APCo as meter reader on July 13, 1992, and that Protective was terminating his long-term disability benefits on July 12, 1992. According to West, the decision to discontinue Brooks' long-term disability benefits was based upon the information in Brooks' claim file, which consisted of medical records, the FCE, and the vocational evaluation. West possessed no job description, job assessment, or evaluation of physical limitations which correlated with the relevant job requirements. Brooks did not undergo the recommended work hardening. West stated that his July 30, 1992, decision was also based on his interpretation of the Plan and that he did not have conclusive proof that Brooks was totally disabled for all occupations as defined under the Plan.

APCo terminated Brooks' employment on July 18, 1992, after Brooks refused to take a job as a meter reader. Protective discontinued Brooks' monthly benefit check of $468.14 as of July 19, 1992. Subsequently, Brooks brought the above-styled action alleging that Protective, as claims administrator, violated ERISA. Plaintiff contends that Protective acted arbitrarily and capriciously in discontinuing his benefits.

According to § 5 of the Plan, the participant must provide Protective with proof of continued total disability in order to remain

---

**16.** According to the correspondence dated July 9, 1991, Protective desired that Brooks undergo vocational evaluation in order to determine Brooks' education, training and experience. The letter also expressed that "[b]ased upon this information, Crawford and Company may be able to determine specific employment opportunities" for a person in Brooks' physical condition.

The July 11, 1991, letter stated that APCo was "taking steps wherever possible to modify positions to re-employ individuals receiving benefits

under the Long Term Disability Plan." West, the drafter of the correspondence, stated that Brooks was required to undergo an FCE administered by the Montgomery Rehabilitation Hospital in order to accurately define Brooks' limitations and physical condition. According to this letter, APCo and Protective were to assess the outcome of Brooks' FCE and vocational evaluation, which would clarify the issue of Brooks' eligibility for re-employment.

eligible for benefits under the Plan. Section 5.03 reads:

> Proof of continued total disability must be furnished to the Claims Administrator at least every six months after furnishing of the initial proof of Total Disability or more frequently if determined by the Claims Administrator to be necessary to establish continued Total Disability. Such proof must include a report in writing from the Participant's attending physician or surgeon fully stating the condition of the Participant and the possible duration of his disability.

All parties agree that the employee benefit plan at issue is governed by the constructs of ERISA, 29 U.S.C.A. § 1001 *et seq.*

> "[e]xcept as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they.... relate to any employee benefit plan described in.... this title and not exempt under.... this title."

29 U.S.C.A. § 1144. Therefore, any and all contrary state substantive law and standards are inapplicable because the United States Supreme Court has held that ERISA preempts state law as to claims made under plans such as the one at issue. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).

### SCOPE OF REVIEW

■ When a beneficiary is denied benefits and he or she challenges that decision under 29 U.S.C. § 1132(a)(1)(B),[17] that decision is to be reviewed under a *de novo* standard unless the benefits plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire and Rubber Company v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Kirwan v. Marriott Corporation*, 10 F.3d 784, 788 (11th Cir.1994).[18] In *Bruch*, the United States Supreme Court subjected Firestone's denial of benefits to de novo review because the Court found ".... no evidence that under Firestone's ... plan the administrator has the power to construe the uncertain terms or that eligibility determinations should be given deference." *Bruch*, 489 U.S. at 115, 109 S.Ct. at 957. If an employee benefit plan confers discretionary authority upon a fiduciary to make eligibility determinations, said fiduciary's decisions will be reviewed under the arbitrary and capricious standard. *Lee v. Blue Cross/Blue Shield of Alabama*, 10 F.3d 1547, 1549–50 (11th Cir. 1994) [citations omitted].

APCo's coordinator of employee benefits services, Helen Spollen, affirmed that Brooks' eligibility would be determined or assessed according to the 1981 Plan. According to this plan, Protective, as claims administrator, possessed specific authority to determine whether Brooks' disability qualified for long-term benefits. Pursuant to the 1981 Plan,

> [t]he claims administrator shall be responsible for determining eligibility for benefits under the plan and payment of such benefits.

Art. 6.02(c), 1981 Plan.[19] Clearly, the Plan vested the authority to determine eligibility

---

**17.** Subsection (B) of 29 U.S.C. § 1132(a)(1) provides:

> A civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C. § 1132(a)(1)(B).

**18.** *See also, Moon v. American Home Assurance Company*, 888 F.2d 86, 88 (11th Cir.1989) ("the circuit courts which have found that particular ERISA plans granted discretion to plan administrators or fiduciaries, in cases after *Firestone*, have uniformly rested this finding upon express language of the ERISA plan before them"); *Baker v. Big Star Division of the Grand Union Company*, 893 F.2d 288, 292 (11th Cir.1989) (noting that a panel of the Eleventh Circuit may have determined that express language of discretionary authority is necessary before the arbitrary and capricious standard is evoked); *Guy v. Southeastern Iron Workers' Welfare Fund*, 877 F.2d 37, 38–39 (11th Cir.1989) (benefit determination "must be reviewed de novo unless the plan expressly gives the administrator discretionary authority to make eligibility determinations or to construe the plan's terms").

**19.** Article 6.02 of the 1981 Plan, entitled "Allocation of Responsibilities," enunciates the relationship between the fiduciaries and the scope of their authority.

for long term disability benefits in the claims administrator, Protective. Therefore, the court must determine whether Protective's decision was arbitrary and capricious.

 Under this standard, the scope of the court's review is narrow and the court is not to substitute its judgment for that of Protective. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mutual*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). To survive scrutiny under the arbitrary and capricious standard, Protective must articulate a satisfactory explanation for action including a rational connection between the evidence before it and its decision. *See Motor Vehicle Mfrs.*, 463 U.S. at 43, 103 S.Ct. at 2866 (quoting *Burlington Truck Lines, Inc., v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962)).

## DISCUSSION

 In applying the arbitrary and capricious standard, the court is required "to look only to the facts known to the administrator at the time the decision was made" to discontinue Brooks' long-term disability benefits. *Lee*, 10 F.3d at 1550 (citing *Jett v. Blue Cross & Blue Shield of Alabama, Inc.*, 890 F.2d 1137, 1139 (11th Cir.1989)). The court must determine whether a reasonable basis existed for the decision, based on the facts as known to Protective at the time it made the determination. *Jett*, 890 F.2d at 1139, *see also Brown v. Retirement Committee of Briggs & Stratton Retirement Plan*, 797 F.2d 521, 532 (7th Cir.1986), *cert. denied*, 479 U.S. 1094, 107 S.Ct. 1311, 94 L.Ed.2d 165 (1987); *Denton v. First National Bank of Waco, Texas*, 765 F.2d 1295, 1304 (5th Cir.1985); *Berry v. Ciba–Geigy Corp.*, 761 F.2d 1003, 1007 (4th Cir.1985).

 Plaintiff contends that the report (from Dr. Ryan) upon which West relied pales in comparison to the eight years of records produced and examinations administered by Dr. Woodall. Plaintiff avers that

Protective has no reasonable basis or rational explanation for no longer relying on the reports and recommendations of Dr. Woodall. Apparently, Plaintiff believes that West's response to APCo's desire for Protective to review the files of employees receiving long-term disability benefits with the express purpose of returning such persons back to work evinces an abuse of discretion.

The Eleventh Circuit has rejected the argument that a treating physician's opinion should be accorded substantial weight by a plan fiduciary in determining eligibility for employer-provided benefits. In *Jett*, the Eleventh Circuit found that the decision by a claims administrator not to contact an employee's treating physician before denying benefits cannot be said to constitute abuse of discretion. *Jett*, 890 F.2d at 1139–40. The court reasoned that a treating physician's economic interest in an ERISA-governed employee health plan offsets the weight given to opinions of treating physicians in the context of social security. *See id.*

Plaintiff places extreme emphasis on the knowledge West possessed on July 1, 1991; however, no decisions were made to resume Brooks' employment, in any capacity, until after the FCE and vocational rehabilitation program had been performed. This was the advice given by Brooks' treating physician, Dr. Woodall. However, Plaintiff alternatively contends that there is no evidence that Protective or APCo relied upon the information contained in the FCE or vocational evaluation in determining whether to reactivate Brooks.

Plaintiff also attacks West's "educational deficiency." Brooks points out that West's educational background in business is not suited for determining the eligibility of persons for long-term disability benefits, which is steeped in medical familiarity. Moreover, Protective did not provide any special training for West in assessing and evaluating the physical fitness of claimants generally, and

---

The Company (APCo), the plan administrator, the claims administrator, (Protective) and the trustee each shall be a Named Fiduciary of the plan. Each fiduciary shall have only those specific powers, duties responsibilities and obligations as are *specifically given* to it under

the plan and trust. Each shall be responsible for the proper exercise of its own powers, duties and responsibilities and obligations under the plan and trust.... (bold and italics added).

Brooks specifically. Essentially, Plaintiff contends that- the decision to discontinue Brooks' long-term disability benefits was APCo's decision and not that of Protective.

As previously noted, Plaintiff relies heavily on the fact that Protective abruptly ceased to accord Dr. Woodall's prognosis full faith, and, instead depended whole-heartedly on Dr. Ryan's results, which were the product of an alleged cursory examination. Plaintiff urges the court to conclude that Protective should not have considered APCo's desire to place able-bodied persons back into the workplace.

However, Protective, as claims administrator, only determines whether an employee is totally disabled for all occupations, given a claimant's education, experience and training. If its conclusion is negative, Protective is obliged to discontinue the benefits or not grant them in the first instance, depending on the phase of inquiry. Protective's function is not to determine the most suitable job for Brooks, but, rather, to determine whether Brooks was totally disabled.

The court's ultimate determination is whether Protective, at the time it determined that Brooks no longer qualified for long-term disability benefits, acted in an arbitrary and capricious fashion. This touchstone determination hinges on whether a reasonable basis existed for Protective's decision to discontinue Brooks' benefits. The United States Supreme Court has stated that:

> a decision is arbitrary and capricious if the decision maker "entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter- to the evidence...."

*Motor Vehicle Manufacturers Ass'n. v. State Farm Mutual,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

In *Duhon v. Texaco, Inc.,* 15 F.3d 1302 (5th Cir.1994), the plaintiff challenged the fiduciary's conduct in discontinuing his long-term disability benefits. There, the United States Fifth Circuit Court of Appeals held that the fiduciary's conduct was not arbitrary and capricious. The court finds that *Duhon* presents a strikingly similar factual scenario as the case at bar.[20]

In *Duhon,* the plaintiff was approved for initial disability benefits through the first twenty-four months following the plaintiff's injury. After the preliminary twenty-four month period, three doctors examined the plaintiff to determine whether the claimant qualified for continued benefits. Two of the three examining physicians concluded that the plaintiff was physically unable to resume his regular occupation as a truck driver and that the plaintiff's condition was permanent. Dr. Thomas Ford determined that Duhon suffered from degenerative lumbar disc disease which severely limited his physical capacity. According to Dr. Thomas' results, Duhon could not squat, stoop, bend, or lift more than twenty-five pounds. Dr. Thomas concluded that although the plaintiff could not return to truck driving, he was capable of doing sedentary to light work. The court also notes that Dr. Thomas intervened at the defendant Texaco's request—which is the situation regarding APCo and Dr. Ryan in the instant action. *Duhon,* 15 F.3d at 1304. Subsequently, the plan administrator and the defendant's chief medical officer reviewed the relevant documents and determined that Duhon did not qualify for continuing long term benefits beyond the initial twenty-four month period. *Id.* Subsequently, Duhon appealed to the plan administrator, but the appeal was unsuccessful.

The Fifth Circuit rejected Duhon's argument that additional information was needed to determine his eligibility. Specifically, Duhon argued that merely because a medical doctor had resolved that sedentary to light work was within physical tolerance did not necessarily mean that he was "qualified by training, education or experience" to perform

**20.** In *Duhon,* the long-term disability benefit plan at issue bore a striking resemblance to the Plan. The plan in *Duhon* provided that "an employee may receive disability payments for the first twenty-four months after the disability begins if the employee is unable to perform the normal duties of his regular job assignment or a comparable one." *Duhon,* 15 F.3d at 1304. The plan in *Duhon* also contained a provision identical in scope to the continued disability benefits prong of the Plan. Following the initial twenty-four month benefit period, disability payments cease "if the employee is unable to perform any job for which he or she is, or may become, qualified by training, education, or experience." *Id.*

any job.[21] *Duhon,* 15 F.3d at 1305. The court found that because the plan administrator possessed sufficient medical evidence to support the view that Duhon could perform "sedentary to light work," the fiduciary had not abused its discretion.

The *Duhon* court also rejected the plaintiff's argument that the evidence of disability was insufficient because the testimony of a vocational rehabilitation expert was essential in determining whether he was capable of performing, given his training, education and experience. *Duhon,* 15 F.3d at 1308. The court chose not to focus on whether the evidence before the plan administrator was sufficiently weighty, but, rather, whether the plan administrator abuse its discretion in determining, without expert testimony, that the plaintiff qualified as permanently disabled.

In the case at bar, Brooks places far too much emphasis on the immaterial issue of whether the occupation APCo asked Brooks to perform accommodates his "disability." Clearly, Plaintiff has confused the issues. The issue is not whether Brooks could perform the job of reading meters, but, rather, whether Protective, based on the information presented to it, acted arbitrarily and capriciously in discontinuing Brooks' long-term benefits. Protective, as claims administrator, was not under any legal duty to concern itself with the occupational position for which Brooks was best-suited. Protective's sole function was to determine eligibility.

Dr. Ryan concluded that Brooks could perform a light duty job. The court finds that at that point Protective could have lawfully removed Brooks from the APCo long term benefit list. Of course, Brooks had recourse to appeal following APCo's determination as to which occupation it would assign Plaintiff.

The court also finds that the results of the FCE and the vocational training program substantiates Protective's decision to terminate Brooks' long-term disability benefits. Plaintiff complains that the persons/entities performing these examinations possessed insufficient knowledge about Brooks to render a competent and intelligent determination regarding Brooks' physical capacity. Even as-

suming this is true, the issue remains: "Whether Protective possessed sufficient knowledge to justify discontinuing Brooks' long-term disability benefits (i.e, whether Protective acted arbitrarily and capriciously in discontinuing Brooks' benefits under the Plan)." Plaintiff has not proven that Protective actually knew and, ultimately, failed to consider the ignorance of the persons and/or entities administering the FCE and the vocational training program.

Moreover, Protective had been informed that Brooks would be returning to work. Certainly, if Protective reasonably believed that Brooks had agreed to return to work, he would hardly qualify as being totally disabled for all occupations for which he was qualified. The court also notes that Plaintiff's argument that APCo overreached and improvidently assumed Protective's Plan-granted authority is likewise without merit. Plaintiff does not demonstrate to the court's satisfaction that APCo, and not Protective, made the final determination to discontinue Plaintiff's long term disability benefits.

## CONCLUSION

The court finds that, in light of the evidence before it at the time it decided to discontinue Brooks' long-term disability benefits, Protective's decision cannot be characterized as arbitrary and capricious. Furthermore, the Court is not authorized to supplant the reasonable judgment of Protective Life Insurance Company, the claims administrator of the ERISA plan at issue, with that of its own.

A judgment in accordance with this memorandum opinion shall be entered separately.

---

21. Duhon persuaded the district court, which granted summary judgment in favor of Duhon. However, the appellate court reversed the district court's grant of summary judgment.